UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COLBY G. MAHAN,

    Plaintiff,

v

    Case No. 1:06-cv-54

    Hon. Wendell A. Miles

DOUGLAS SUNDMACHER and
JEFFERY RUTHIG,

    Defendants.

_____/

OPINION AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

In this action, plaintiff Colby Mahan asserts federal claims arising from an incident during which he was handcuffed and placed in a Michigan State Police cruiser by the defendants during the early morning hours of May 2, 2004. The matter is currently before the court on a motion by the defendants for summary judgment (docket no. 16). Plaintiff has not filed any written response to the motion. For the reasons to follow, the court GRANTS the motion.

**I**

Plaintiff Colby Mahan is a resident of Emmett County, Michigan. Defendants Douglas Sundmacher and Jeffery Ruthig, also residents of Emmett County, were, at all times material to this action, state troopers employed by the Michigan State Police. Sundmacher and Ruthig were partners assigned to the Petoskey, Michigan post of the State Police. They were working a shift which covered the period from 10:00 p.m. on May 1, 2004 to 6:00 a.m. on May 2, 2004.

At approximately 1:00 a.m. on May 2, 2004, plaintiff was patronizing a Petoskey business known as the Upstairs Club. The Upstairs Club was a licensed liquor establishment serving alcoholic beverages. Plaintiff was standing near the club's bar when he was approached by Sundmacher, who asked plaintiff for identification. Plaintiff responded by producing a temporary paper license which contained his name but – apparently – not his photograph. Sundmacher also asked plaintiff to submit to a portable breathalyzer test. Plaintiff's complaint alleges that he did submit to the breathalyzer test. However, plaintiff also alleges that afterward, and for no apparent reason, he was arrested. Plaintiff alleges that the defendants handcuffed him and escorted him outside to the rear seat of their police cruiser, where they demanded that he "provide evidence" that the owner of the Upstairs Club was violating Michigan's liquor control laws. Plaintiff alleges that he refused to do so. There is no dispute that plaintiff was released and no charges were filed against him in connection with the incident.

The defendants' version of these events, as substantiated by depositions which they have submitted in support of their motion, is somewhat the same but also somewhat different from plaintiff's. According to Sundmacher and Ruthig, they went to the Upstairs Club on the night in question as to perform a liquor control inspection.[1] The troopers were in full uniform. Because Sundmacher suspected that Mahan might be under legal drinking age, and because Mahan appeared to be intoxicated, Sundmacher asked Mahan to produce identification. Somewhat suspicious of the temporary paper license which Mahan produced, and still suspicious that

---

[1] Problems associated with the Upstairs Club and its companion business, Leo's Lounge, were the subject of an earlier action filed by the club's owner against Sundmacher, Ruthig, and two City of Petoskey police officers. That action, <u>Smith v. Sundmacher</u>, No. 1:05cv64, has been dismissed on the merits.

Mahan had been served alcohol while visibly intoxicated, Sundmacher asked Mahan to accompany him to a quieter area of the bar where they could talk.

According to Sundmacher, he requested that Mahan produce some additional identification and also asked whether Mahan would agree to take a breathalyzer test, which could be used in citing the Upstairs Club for a liquor control violation.  As Sundmacher and Mahan were talking, Ruthig noticed the two and approached.  At this point, Mahan began to walk away.  Believing that Sundmacher was not finished talking to Mahan, Ruthig took Mahan by the arm in order to "check" his movement away from Sundmacher.  Upon seeing this movement, Sundmacher mistakenly assumed that Mahan had assaulted Ruthig.  Both troopers then moved to detain Mahan at the same time.  After applying handcuffs, they escorted Mahan outside and placed him in the back of their patrol car.

According to Ruthig, in helping Sundmacher detain Mahan, Ruthig was simply following his partner's lead.  Ruthig did not become aware until later, after they had put Mahan in the patrol car,  that Sundmacher was under the mistaken impression that Mahan had assaulted Ruthig.  After discussing the matter between themselves, confirming that no assault had occurred and confirming through radio contact with dispatch that Mahan was of legal drinking age, the troopers decided not to charge Mahan with any offenses.  Mahan, however, did agree to take a breathalyzer test, which registered a blood alcohol level of .16.[2]  Although Mahan was released, Sundmacher submitted a form to Michigan's Liquor Control Commission citing the Upstairs

---

[2]Although there is no dispute that Mahan was not observed by Sundmacher and Ruthig to have been operating a motor vehicle nor was he charged with any offense, the court notes that Michigan's DUI law provides that a person having a blood alcohol level of .08 or more is considered to be intoxicated.  M.C.L. § 257.625(1)(b).

Club for a liquor control violation.

Plaintiff Mahan filed this action on January 23, 2006. Discovery was to have been completed by not later than December 1, 2006. The defendants filed the present motion on January 16, 2007. As noted above, plaintiff has not responded to the motion.[3]

## II

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553 (1986). While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita

---

[3]The failure to respond to a motion for summary judgment is inexcusable neglect. E.g., Kendall v. Hoover Co., 751 F.2d 171, 175 (6th Cir. 1984).

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 1356 (1986). Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

"The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996). Where the non-moving party fails to respond to a motion for summary judgment, the court's task is to determine whether the moving party has met its burden, i.e., whether the facts, as presented by the moving party, require a determination that the party is entitled to judgment as a matter of law. Cacevic v. City of Hazel Park, 226 F.3d 483, 491 (6th Cir. 2000). In such instances, the court's reliance on the facts advanced by the movant is proper and sufficient. Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 404 (6th Cir. 1992). Although the court must "intelligently and carefully review the legitimacy of such an unresponded-to motion," id. at 407, it need not conduct its own "probing investigation" of the record for evidence that might demonstrate genuine issues of material fact. Id. at 405.

### III

To state a claim for relief in an action brought under § 1983, a plaintiff must establish both that he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of state law. E.g., American Mfrs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985 (1999). Where the defendant makes a properly supported summary judgment motion in such an action, the non-moving party

must demonstrate a genuine issue of material fact as to these two elements.  Miller v. Calhoun County, 408 F.3d 803, 812 (6th Cir. 2005).  Here, the defendants do not dispute that they acted under color of state law.  What they do dispute is whether plaintiff can establish that he was deprived of a right secured by the Constitution.

The defendants also argue that they are entitled to qualified immunity.  In resolving questions of qualified immunity, courts are required to resolve the following threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Scott v. Harris, 127 S.Ct. 1769, 2007 WL 1237851, *3 (U.S. Apr. 30, 2007).  "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case.'"  Id. (citation omitted).   The court must therefore first turn to the threshold inquiry: whether the defendants' actions violated the Fourth Amendment.

In his complaint, plaintiff alleges that the defendants have violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  The defendants have challenged each of these constitutional claims.  As noted above, plaintiff has not responded to the motion.   Plaintiff has not identified any material facts which are in dispute, and the court is in a position to rule on the legal issues raised by the defendants' motion.

### A. Fourteenth Amendment - Substantive Due Process

Section 1983 actions based on deprivations of due process fall into two categories: violations of procedural due process and violations of substantive due process.  Midkiff v. Adams County Regional Water District, 409 F.3d 758, 762 (6th Cir. 2005).  In his complaint,

plaintiff alleges that the defendants violated "his right to liberty protected in the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  Complaint at 3, ¶ 13(a).  Plaintiff has therefore attempted to allege a violation of substantive due process.   However, the defendants argue that this substantive due process claim is subject to dismissal as a matter of law because the Fourth Amendment provides an explicit textual source of constitutional protection against any unreasonable seizure.

The defendants are correct that the Fourth Amendment provides an explicit constitutional protection against unreasonable searches and seizures.  See Boone v. Spurgess, 385 F.3d 923, 933 (6th Cir.2004) ("a specific constitutional guarantee – that all seizures be reasonable – trumps a more general guarantee – that all government action conform with substantive due process"); see also County of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715 (1998) (Substantive due process analysis is inappropriate if claim is covered by the Fourth Amendment, which covers searches and seizures).  "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 813 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989)).  To the extent that plaintiff is contending that his arrest provides a basis for a claim under 42 U.S.C. § 1983, it is the Fourth Amendment, and not substantive due process, which provides the analytical framework for his claim.   Because the Fourth Amendment provides plaintiff with constitutional protection, he has no claim based on substantive due process and the defendants are entitled to judgment in their favor as a matter of law on plaintiff's substantive due process claim.

**B. Fourth Amendment**

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]" The defendants argue that plaintiff's Fourth Amendment claim fails because neither officer unreasonably seized plaintiff. Specifically, the defendants contend that their temporary seizure of plaintiff was reasonable under principles articulated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).[4]

---

[4]At the outset, it is noted that the defendants have made no arguments in their motion regarding the issue of the breathalyzer. This is understandable, insofar as plaintiff has not asserted a Fourth Amendment claim based on the administration of the breathalyzer. The only statement in the complaint in this case regarding the breathalyzer consists of plaintiff's allegation that he "was asked to submit to a portable breathalyzer test and he did so." Complaint at 2, ¶ 7. Although the complaint alleges that the defendants violated his Fourth Amendment right to be free from unreasonable seizure, id. at 3, ¶ 13(b), plaintiff does not allege that either of the defendants violated his Fourth Amendment right to be free from unreasonable search by simply requesting that he take a breathalyzer.

That is not to say that the administration of a breathalyzer test may never present concerns under the Fourth Amendment. The Fourth Amendment may be implicated in such situations because the detaining and testing of an individual for the use of alcohol by means of a breathalyzer is a search within the meaning of this amendment. Shoemaker v. Handel, 619 F.Supp. 1089, 1098 (D.N.J. 1985), aff'd, 795 F.2d 1136 (3d Cir. 1986); see also Spencer v. City of Bay City, 292 F.Supp.2d 932, 939 (E.D. Mich. 2003) ("It is well established that the taking of a breath sample to test for the presence of alcohol constitutes a search under the Fourth Amendment") (citations omitted). Even though administration of the breathalyzer amounted to a search, it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-2044 (1973). If plaintiff voluntarily consented to take the breathalyzer, then he of course waived his Fourth Amendment rights based on this "search." See United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004) ("It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search"). Whether or not plaintiff consented to take the breathalyzer, the fact remains that plaintiff's complaint simply does not assert a Fourth Amendment claim based on his submission to the test. Therefore, because the allegations of the complaint and the defendants' Fourth

(continued...)

Two requirements must be met in order for a plaintiff to successfully prevail on a claim based on the Fourth Amendment. First, the plaintiff must establish a "seizure" of his person. See California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 1549 (1991). Second, the plaintiff must establish that the seizure was "unreasonable." See Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960) ("It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures"). Here, plaintiff has unquestionably established that a seizure occurred, and the defendants do not dispute the fact that plaintiff was "seized" once his movement was restrained. See Hodari D., 499 U.S. at 626, 111 S.Ct. at 1550 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement").[5] Therefore, this case boils down to whether plaintiff was "unreasonably" seized given the undisputed facts of this case.

As noted above, the defendants analyze their seizure of plaintiff under the principles announced in Terry, 392 U.S. 1. "Terry, a limited exception to the normal requirements of probable cause, permits a police officer briefly to detain a person or property for investigative

---

[4](...continued)
Amendment arguments are limited to issues presented by the seizure of plaintiff – including the detention and handcuffing – the court's analysis will also be limited to these issues.

[5]Sundmacher's mere questioning of plaintiff did not constitute a seizure for Fourth Amendment purposes. See Immigration and Naturalization Serv. v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762 (1984) ("police questioning, by itself, is unlikely to result in a Fourth Amendment violation"). However, there is no doubt that when Sundmacher decided to detain plaintiff, either for the purpose of confirming plaintiff's age or because he believed that plaintiff had assaulted Ruthig, Sundmacher performed a seizure of plaintiff's person subject to the requirements of the Fourth Amendment. See Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640 (1979) (officers who detained appellant for the purpose of requiring him to identify himself performed Fourth Amendment seizure). Because Ruthig assisted Sundmacher, Ruthig's actions are also subject to the same constitutional requirements.

purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005). In evaluating the constitutionality of a Terry stop, courts engage in a two-part analysis of the reasonableness of the stop:

> We first ask 'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.' . . . In answering this question, we examine the totality of the circumstances to determine the reasonableness of the investigatory stop. . . .
> Next, if we conclude that the basis for the Terry stop was proper, then we must determine 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.' . . . As part of the second prong, we must 'ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available.'" . . . For while a *Terry* stop may be constitutionally permissible initially, it may become an impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable circumstances.' . . . Simply put, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' . . . While there is 'no rigid time limitation on the lawfulness of a *Terry* stop,' . . . we must 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'

Davis, 430 F.3d at 354 (6th Cir. 2005) (citations omitted).

The defendants argue that while they were conducting legitimate police work involving liquor control violations, including whether the Upstairs Club was over-serving patrons or serving underage patrons,[6] they encountered plaintiff, who appeared both intoxicated and of a

---

[6]Michigan law generally prohibits minors from purchasing and consuming alcohol. M.C.L. §§ 436.1703(1), 436.1906(1)(c). It also prohibits the sale of alcohol to a visibly
(continued...)

10

questionable age to be consuming alcohol. When Sundmacher asked plaintiff to produce identification to verify his age, plaintiff provided only a paper license with no photo which would help confirm plaintiff's identity. At that point, Sundmacher had cause to detain and question plaintiff concerning possible criminal activity occurring at the bar.

When plaintiff pulled away from Ruthig in a manner that appeared to Sundmacher that plaintiff had physically assaulted his partner, Sundmacher placed plaintiff in handcuffs and removed him from the bar. Once outside the bar, they placed plaintiff in the rear of the patrol car. At this point, Sundmacher and Ruthig discussed what had happened, and Ruthig confirmed that plaintiff had not assaulted him. The officers were also able to confirm plaintiff's identity and age, and he was released.

The defendants' brief detention of plaintiff, initiated by Sundmacher after observing what he thought was a potential assault on Ruthig, was reasonable. However, the question is whether the detention ripened into an arrest when they handcuffed plaintiff, removed him from the premises, and put him in the rear of a patrol car. Although there is no "litmus-paper test" for determining when a seizure exceeds the bounds of an investigative stop, Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329 (1983), in making this determination the Sixth Circuit has considered such factors as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force[.]" United States v. Richardson, 949 F.2d 851, 857 (6th Cir.1991).

---

⁶(...continued)
intoxicated person. M.C.L. §436.1906(1)(c). Both violations are misdemeanors. M.C.L. §§ 436.1703(1), 436.1909.

11

In Richardson, the court concluded that law enforcement officers had "crossed the line" from an investigative detention into an arrest when they placed the defendant in the back of a police car." Id. at 857. Similarly, in United States v. Butler, 223 F.3d 368, 375 (6th Cir.2000), a non-unanimous panel observed, "officers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning[.]" On the other hand, although the use of handcuffs and detention in a police cruiser "do not automatically transform a Terry stop into an arrest, these displays of force must be warranted by the circumstances." Smoak v. Hall, 460 F.3d 768, 781 (6th Cir. 2006). Based on the facts known to the officers at the time of the stop, the use of handcuffs and/or detention of persons in police cruisers may be reasonable where such precautions are reasonably related to the investigation that warranted the initial stop. Houston v. Clark County Sheriff Deputy John Does 1 - 5, 174 F.3d 809, 815 (6th Cir. 1999). In addition, the length of the stop must also be considered. See id. ("There is no rigid time limit for a Terry stop. . . . When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate").

Here, the facts presented by the defendants in support of their motion indicate that although plaintiff was handcuffed, escorted out of the bar, and placed in the patrol car because of Sundmacher's perception that plaintiff had pushed or assaulted Ruthig. This was not only a reasonable extension of the initial stop, but also a reasonable precaution in view of the perceived potential assaultive risk. According to the defendants, the entire interaction between them and plaintiff lasted less than 30 minutes. Ruthig estimated that plaintiff was held in the patrol car for only approximately 10 minutes, while plaintiff, in his testimony, estimated that he was in the

patrol car for approximately 15 to 20 minutes.  However, it is undisputed that the defendants held plaintiff only as long as necessary for them to confirm plaintiff's identity and age and to determine that he had not in fact assaulted Ruthig.  Under these facts, the court concludes as a matter of law that neither the force used against plaintiff nor the length of his detention exceeded the permissible scope of a Terry stop.  Both the initial questioning and subsequent brief detention of plaintiff were reasonable and did not violate the Fourth Amendment.

Because plaintiff's complaint alleges that the handcuffs "were applied in such a manner that they were too tight, causing great pain[,]" the defendants have also separately addressed the use of this force in the context of an excessive force claim.  "[T]he right to be free from excessive force is a clearly established Fourth Amendment right."  Neague v. Cynkar, 258 F.3d 504, 507 (6th Cir. 2001).  A claim of excessive force during handcuffing falls within that right.  See id.; Solomon v. Auburn Hills Police Dept., 389 F.3d 167, 173 (6th Cir. 2004).  However, not all allegations of tight handcuffing amount to excessive force.  Lyons v. City of Xenia, 417 F.3d 565, 575 (6th Cir. 2005).  "In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, . . . and must show that officers ignored [his] complaints that the handcuffs were too tight[.]"  Id. at 575-576 (citing Neague, 258 F.3d at 508, and Burchett v. Kiefer, 310 F.3d 937, 944-945 (6th Cir. 2002)).  Plaintiff has not satisfied these requirements here.  He has only alleged that the handcuffs were tight.  According to plaintiff's deposition testimony, his hands were sore for a few days.  (A "little scar" he claims to have had at one point was gone by the time he was deposed.)  However, plaintiff does not claim that he ever told the defendants that the handcuffs were too tight.  Under the circumstances, he has not established a genuine issue of material fact on a claim of excessive force based on handcuffing.

13

## C. **Qualified Immunity**

Because the court concludes that the defendants did not violate the Fourth Amendment, the court need not reach the issue of qualified immunity.[7]  See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").  However, it is nonetheless appropriate at this point to observe that even if the defendants were mistaken in their treatment of plaintiff, they are still immune from liability. "Officers can have reasonable, but mistaken, beliefs as to the facts" forming the premise of their actions, "and in those situations courts will not hold that they have violated the Constitution." Id., 533 U.S. at 206, 121 S.Ct. at 2158.  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter v. Bryant, 502 U.S. 224, 228-229, 112 S.Ct. 534, 537 (1991) (citation omitted).  Officials do not lose qualified immunity by being mistaken, so long as their decisions are reasonable based on the law and the information possessed by the officials.  See Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040 (1987) (the relevant question is whether a reasonable officer could have believed his actions to be lawful, in light of clearly established law and the information the officers possessed).  Here, the defendants could, as a matter of law, have reasonably believed that plaintiff's brief detention was lawful.  For this reason, they are entitled to qualified immunity.

---

[7] The applicability of qualified immunity to a given set of facts is a question of law. Garvie v. Jackson, 845 F.2d 647, 649 (6th Cir.1988).

14

## **Conclusion**

The motion of the defendants for summary judgment is granted, and this case is dismissed in its entirety.

So ordered this 10th day of May, 2007.

 /s/ Wendell A. Miles
Wendell A. Miles, Senior Judge
